# OPERATING AGREEMENT

OF

BDC 56 LLC

THIS OPERATING AGREEMENT (the "Agreement") made as of December 15, 1997 by and between WEST 56TH HOTEL LLC, a New York limited liability company with its principal place of business at 3010 Westchester Avenue, Purchase, New York 10577 ("56 LLC") and THE NAJJAR GROUP LTD., a New York corporation with its principal place of business at 200 East 89th Street, Suite 31C, New York, New York 10128 ("Najjar").

## ARTICLE I

## DEFINITIONS

"Additional Capital Contributions" shall mean contributions to the Company made by a Member pursuant to Article VI hereof.

"Additional Member" shall have the meaning set forth in Section 9.4.

"Agreement" shall mean this operating agreement as originally executed and as amended from time to time.

"Articles of Organization" shall mean the Articles of Organization of BDC 56 LLC as filed with the New York Secretary of State, as the same may be amended from time to time.

"Base Rate" shall mean the interest rate publicly announced by Citibank, N.A., or its successor, as its "prime rate" or "base rate."

"Capital Account" as of the date hereof shall be the amount contributed by each Member initially upon the execution of the Agreement, which amount shall be adjusted pursuant to Section 5.3 hereof.

"Capital Contribution" shall mean the cash that a Member contributes to the Company.

"Capital Transaction" shall mean a transaction which is (i) a sale, condemnation, exchange or other disposition of all or a portion of the Property, the hotel on the Property or other assets of the Company, (ii) a borrowing, whether secured or unsecured, including a mortgage of all or a portion of the Property, (iii) a transaction which will result in a dissolution of the Company, (iv) an insurance recovery, or (v) any other similar transaction not in the ordinary course of business which results in proceeds to the Company which are not derived from the operation of the Property.

"Company" shall refer to BDC 56 LLC.

"Computation Date" shall have the meaning set forth in Section 6.5.

"Failing Member" shall have the meaning set forth in Section 6.4.

"Family Member" shall mean (a) the parents of a Member or the parents of such Member's spouse, (b) the brothers and sisters of the parents of a Member or of a Member's spouse and their lineal descendants, (c) the brothers and sisters (whether natural or adopted) of a Member or a Member's spouse and their lineal descendants, (d) a Member's spouse, (e) a Member's natural or adopted descendent's or the spouse of any such descendent, (f) an inter vivos or testamentary trust provided that the ultimate beneficiary or beneficiaries of the corpus of the trust (without regard to income beneficiaries or other intermediate beneficiaries) is or are a Member and/or one or more of the Family Members specified in provisions (a) through (e) and (g), (g) a corporation, partnership, limited liability company or other entity that is wholly-owned by the Member and/or one or more of the Family Members specified in provisions (a) through (f) at all times during which such entity owns an Interest, or (h) when a Member is a corporation, partnership, limited liability company or other entity, a Family Member shall mean the Family Members specified in provisions (a) through (g) with respect to a person who owns all or any portion of such Member on the date hereof.

"Fiscal Year" with respect to the Company shall mean the calendar year.

"Initial Capital Contributions" shall have the meaning set forth in Section 5.2.

"Involuntary Withdrawal" shall mean, with respect to any Member, the occurrence of any of the following events:

(i) the Member makes an assignment for the benefit of creditors;

(ii) the Member files a voluntary petition of bankruptcy;

(iii) the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) the Member files a petition seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation;

(v) the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi) the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii) if the Member is an individual, the Member's death, incapacity or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

(ix) if the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company; or

(x) if the Member is a corporation, the dissolution of the corporation or the revocation of its charter.

"IRC" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

"Manager" shall mean 56 LLC.

"Member" shall mean each of the parties who executes a counterpart of this Agreement as a Member and each party who becomes a Member.

"Net Cash Flow from Operations" shall mean the excess of (i) all gross receipts of the Company (including the proceeds resulting from the reduction or elimination of reserves) other than Capital Contributions by the Members and the proceeds of Capital Transactions over (ii) cash expenditures of the Company, including reserves, capital expenditures not paid from Capital Contributions by the Members or from the proceeds of Capital Transactions, all debt service and other payments on loans obtained by the Company, whether the loans are from third parties or from Members, whether secured or unsecured, management fees for the operation of the hotel on the Property, amounts due and payable pursuant to agreements to which the Company is a party and all other costs of operating, managing and maintaining a hotel on the Property.

"Net Proceeds of a Capital Transaction" shall mean the proceeds received by the Company in connection with a Capital Transaction after payment of all costs and expenses incurred by the Company in connection with such Capital Transaction including, without limitation, brokers' commissions, loan fees, loan payments, other closing costs and the cost of any alteration, improvement, restoration or repair of the Property necessitated by or incurred in connection with such Capital Transaction and repayment of or the establishment of reserves for payment of the obligations of the Company to be paid from the proceeds of such transaction, including loans, whether from third parties or Members.

"New York Limited Liability Company Law" shall mean Chapter 34 of the New York Consolidated Laws as the same may be amended from time to time.

"Notices" shall mean any notice, demand, request or other communication required or permitted to be given or made hereunder.

"Permitted Transferee" shall have the meaning set forth in Section 9.2.

"Profits" and "Losses" for each Fiscal Year or other period shall mean an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with IRC Section 703(a).

"Property" shall refer to that certain parcel of land located at 13-15 West 56th Street, New York, New York.

"Purchase Agreement" shall mean the agreement dated October 21, 1997 between Investment Associates, as seller, and Najjar as purchaser, for the Property, a copy of which is annexed hereto as Exhibit A.

"Related Entity" shall mean, with respect to any Member, any other Member, corporation, partnership, entity or person controlled by, controlling or under common control with such Member or any director, officer, executive employee, shareholder, member or partner of such Member. As used herein, "control" shall mean the ability and authority to take action and make decisions on behalf of a corporation, partnership, limited liability company or other entity or person.

"Regulations" shall mean the Income Tax Regulations promulgated under the IRC as such regulations may be amended from time to time (including Temporary Regulations).

"Start Up Expenses" shall mean the costs and expenses of the Company for the acquisition of the Property, development and construction of a hotel on the Property, the purchase of furniture, fixtures and equipment, the payment of commissions to brokers with respect to the formation of the Company and/or the acquisition of the Property, the costs incurred prior to the opening of the hotel for business and the operating losses incurred during the first thirty-six (36) months after the hotel opens for business.

"Transfer" shall have the meaning set forth in Section 9.1.

"Transferor" shall have the meaning set forth in Section 9.2.

"Voluntary Withdrawal" shall mean a Member's disassociation from the Company by means other than a Transfer or an Involuntary Withdrawal.

## ARTICLE II

## FORMATION

Section 2.1 Formation. The Members hereby confirm that they have formed a limited liability company by causing M. James Spitzer, Jr., as organizer, to execute an Articles of Organization of the Company under Section 203 of the New York Limited Liability Company Law and to file such articles with the New York Department of State in accordance with the New York Limited Liability Company Law on December 15, 1997. The Members hereby adopt this Agreement as the operating agreement of the Company.

Section 2.2 Name. The name of the Company is "BDC 56 LLC".

Section 2.3 Applicable Law. The Company shall be subject to and the Agreement shall be construed in accordance with the laws of the State of New York.

Section 2.4 Business Office. The business office of the Company shall be located at 3010 Westchester Avenue, Purchase, New York 10577, or at such other location or locations as the Manager may from time to time select.

Section 2.5 Fiscal Year. The fiscal year of the Company shall end on December 31 in each year.

Section 2.6 Purpose. The Company has been formed for the following purposes and its business activities shall be limited to: (i) accepting Najjar's rights and assuming Najjar's obligations under the Purchase Agreement, (ii) acquiring the Property in accordance with the terms and conditions of the Purchase Agreement, (iii) upon acquisition of the Property, developing and constructing a hotel thereon, including acquiring furniture, fixtures, equipment and supplies, (iv) owning, managing, operating, maintaining and repairing the Property or contracting with or entering into leases or franchise agreements with others for the management, operation, maintenance and improvement of the Property, (v) selling, transferring, exchanging, leasing, assigning or disposing of or otherwise receiving the avails of all or any portion of the assets of the Company including the Property, (vi) financing and refinancing the business of the Company, whether such financing or refinancing is unsecured or secured in whole or in part by the Company's assets, and (vii) doing all other things necessary or deemed useful by the Manager for any of the foregoing. The Company shall not engage in any other business or activity.

"Transfer" shall have the meaning set forth in Section 9.1.

"Transferor" shall have the meaning set forth in Section 9.2.

"Voluntary Withdrawal" shall mean a Member's disassociation from the Company by means other than a Transfer or an Involuntary Withdrawal.

## ARTICLE II

## FORMATION

Section 2.1 Formation. The Members hereby confirm that they have formed a limited liability company by causing M. James Spitzer, Jr., as organizer, to execute an Articles of Organization of the Company under Section 203 of the New York Limited Liability Company Law and to file such articles with the New York Department of State in accordance with the New York Limited Liability Company Law on December 15, 1997. The Members hereby adopt this Agreement as the operating agreement of the Company.

Section 2.2 Name. The name of the Company is "BDC 56 LLC".

Section 2.3 Applicable Law. The Company shall be subject to and the Agreement shall be construed in accordance with the laws of the State of New York.

Section 2.4 Business Office. The business office of the Company shall be located at 3010 Westchester Avenue, Purchase, New York 10577, or at such other location or locations as the Manager may from time to time select.

Section 2.5 Fiscal Year. The fiscal year of the Company shall end on December 31 in each year.

Section 2.6 Purpose. The Company has been formed for the following purposes and its business activities shall be limited to: (i) accepting Najjar's rights and assuming Najjar's obligations under the Purchase Agreement, (ii) acquiring the Property in accordance with the terms and conditions of the Purchase Agreement, (iii) upon acquisition of the Property, developing and constructing a hotel thereon, including acquiring furniture, fixtures, equipment and supplies, (iv) owning, managing, operating, maintaining and repairing the Property or contracting with or entering into leases or franchise agreements with others for the management, operation, maintenance and improvement of the Property, (v) selling, transferring, exchanging, leasing, assigning or disposing of or otherwise receiving the avails of all or any portion of the assets of the Company including the Property, (vi) financing and refinancing the business of the Company, whether such financing or refinancing is unsecured or secured in whole or in part by the Company's assets, and (vii) doing all other things necessary or deemed useful by the Manager for any of the foregoing. The Company shall not engage in any other business or activity.

# ARTICLE III

## MANAGEMENT

Section 3.1 Management. The business and affairs of the Company shall be managed exclusively by the Manager, who shall have full and complete authority, power, and discretion to manage and control the business, affairs and assets of the Company, to make all decisions regarding those matters, to perform any and all other acts or activities customary or incident to the management of the Company's business and to exercise all powers granted under the New York Limited Liability Company Law. The Manager shall have full authority to execute any and all agreements, documents and instruments on behalf of the Company and all such agreements, documents and instruments so executed shall when delivered be binding upon and enforceable against the Company. All third parties may rely without any investigation as to its authority on any agreement, document or instrument executed by the Manager. No other Member shall have any rights, authority or power to participate in any manner in respect of the management and control of the business affairs and assets of the Company and under no circumstances may any other Member sign for or bind the Company. Notwithstanding the foregoing, the Manager shall not admit an Additional Member to the Company without the prior written consent of Najjar if such admission would dilute the Interest of Najjar in the Company or otherwise adversely affect distributions of the Company to Najjar.

Section 3.2 Fees Payable to the Manager. The Manager shall receive a fee for managing the business and affairs of the Company equal to three (3%) percent of the gross receipts received by the Company other than Capital Contributions by the Members and the proceeds of Capital Transactions during each fiscal year. The Manager shall estimate the amount of the fee on a monthly basis and have the Company pay the estimated amount on the first day of each month. The Manager and the Company shall reconcile the estimated payments with the actual amount due to the Manager each fiscal year on the basis of the annual financial statement of the Company. The Company shall bear the reasonable costs normally associated with management responsibilities. The Company's obligation to pay the Manager its fee shall continue until the Company is dissolved and its affairs are wound up. The obligation of the Company to pay the Manager a fee for its services shall, for all purposes, be subordinate to the lien of any mortgage encumbering the Property or any other recorded or filed security instrument now or hereafter encumbering the Property.

Section 3.3 Related Entities. The Manager shall have the right to cause the Company to enter into contracts or otherwise deal with any Related Entity in any capacity, except that the terms of any such arrangement shall be commercially reasonable.

Section 3.4 Liability and Indemnification of Members. The Company agrees to indemnify and hold harmless the Members to the maximum extent permitted under the New York Limited Liability Company Law from and against any and all claims, actions, demands, losses, costs, expenses (including reasonable attorney's fees and court costs), damages, loss and threat of loss, as a result of any claim or legal proceeding related to any action taken or omitted to be taken in connection with the business and affairs of the Company (including the settlement of any such

claim or legal proceeding); provided, however, no indemnification shall be made if a judgment or other final adjudication adverse to such Member shall establish (a) that acts of the Member or Related Entity were committed in bad faith or were the result of active and deliberate dishonesty, or (b) that the Member or Related Entity personally gained in fact a financial profit or other advantage to which he was not legally entitled or entitled pursuant to the terms of this Agreement.

Section 3.5 Duty to Keep Books. At all times during the existence of the Company, the Company shall keep full and true books and records of the Company as required under Section 1102 of the New York Limited Liability Company Law. Such books and records shall at all times be maintained at the principal office of the Company.

Section 3.6 Tax Matters Partner. The Manager is hereby designated as "tax matters partner" of the Company for federal income tax purposes. The tax matters partner shall receive no separate compensation for its services. The tax matters partner shall keep the Company informed of all notices from government taxing authorities which may come to the attention of the tax matters partner. The Company shall pay and be responsible for all third party costs and expenses incurred by the tax matters partner in performing its duties.

Section 3.7 Tax Elections. The Manager shall have the authority to make all Company elections permitted under the IRC, including, without limitation, elections of methods of depreciation and elections under the IRC Section 754. The decision to make or not make an election shall be at the Manager's sole and absolute discretion.

Section 3.8 Indemnification of the Manager. The Company shall indemnify and hold the Manager harmless from and against any and all claims, damages, losses, liabilities and expenses, including but not limited to, reasonable attorneys' fees, which the Manager actually suffer or incur by reason of the performance of its obligations under this Agreement, provided that the Company shall not be liable for any such claim, damage, loss, liability or expense which arises out of or is based upon the fraud or willful misconduct of the Manager or Related Entities. Any indemnity under this Section shall be paid from and to the extent of the Company assets only.

3.8.1 The Manager shall indemnify and hold the Company, its employees and its Members harmless from and against any and all claims, damages, losses, liabilities and expenses, including, but not limited to, reasonable attorneys' fees, arising out of the fraud or willful misconduct of the Manager, its Related Entities in connection with the performance of its duties hereunder which the Company, its employees or its Members actually suffer or incur.

Section 3.9 Tenure. The Manager shall serve until the Company is dissolved in accordance with Article X.

Section 3.10 Duties of the Manager. The Manager shall devote such time to the business and affairs of the Company as is reasonably necessary to carry out its duties as set forth herein. The Members acknowledge that the members of the Manager are involved in the operation

of other properties which are competitive with the Property and may in the future manage and/or operate properties which are competitive with the Property.

Section 3.11 . Consulting Agreement. In order to assist the Manager to develop and construct a hotel on the Property and to facilitate the resolution of issues that could impede or delay the opening of the hotel for business, the Company hereby agrees to retain Jesse Najjar as a consultant. The Company desires to make use of the knowledge and experience of Mr. Najjar and Mr. Najjar desires to be engaged as a consultant by the Company. Mr. Najjar shall devote such time, attention and energies to the performance of his duties as he, in his sole discretion, believes is necessary to perform his responsibilities hereunder.

3.11.1 The term of the consulting agreement shall commence on the first day of the month following the acquisition of the Property by the Company and shall expire on the earlier of (i) the second anniversary of such date, or (ii) the date that the hotel on the Property opens for business.

3.11.2 As compensation to Mr. Najjar for his services as a consultant and for making himself available to perform services upon request, the Company shall pay Mr. Najjar a fee of Seventy-Five Thousand ($75,000.00) Dollars per year, payable in equal monthly installments of Six Thousand Two Hundred Fifty ($6,250.00) Dollars. The Company shall not have the right to terminate Mr. Najjar's compensation at any time during the term of the consulting agreement for any reason whatsoever, other than fraud, embezzlement or other criminal conduct, unless Mr. Najjar submits a written resignation to the Company.

3.11.3 Mr. Najjar agrees to hold in confidence any and all written confidential information that he receives concerning the operation and finances of the Company and agrees that he will not utilize written confidential information for purposes other than as set forth in this Section 3.11. The agreement between the Company and Mr. Najjar shall not be assigned by Mr. Najjar.

## ARTICLE IV

## MEMBERS AND ASSIGNEES

Section 4.1 Rights of Members to Inspect Books and Records, Etc. Each Member shall have the right to inspect and copy the Company's books and records at the business office of the Company described in Section 2.4 at any reasonable time. Any copying shall be done at such Member's sole cost and expense.

4.1.1 The Company shall deliver to each Member as soon as practicable after the close of the Company's fiscal year, financial statements of the Company for the preceding fiscal year. A tax return will be prepared by the Company's accountants and "K-1" forms or similar forms from the Internal Revenue Service will be distributed by the Company to the Members as soon

the Company described in Section 2.4 at any reasonable time. Any copying shall be done at such Member's sole cost and expense.

4.1.1 The Company shall deliver to each Member as soon as practicable after the close of the Company's fiscal year, financial statements of the Company for the preceding fiscal year. A tax return will be prepared by the Company's accountants and "K-1" forms or similar forms from the Internal Revenue Service will be distributed by the Company to the Members as soon as practicable following the end of the Company's fiscal year. The fees incurred in preparing such tax returns and any review or audit of financial statements or records are to be borne by the Company.

Section 4.2 Members. The Members on the date hereof are 56 LLC, which owns an eighty (80%) percent Interest in the Company and Najjar, which owns a twenty (20%) percent Interest in the Company.

Section 4.3 Limitations on Rights of Members. Except as otherwise specifically provided in this Agreement to the contrary, no Member individually shall have the right:

4.3.1 To sign for or bind the Company, such power being vested in the Manager;

4.3.2 To have his Capital Contribution repaid except to the extent provided in this Agreement or to withdraw or reduce his Capital Account, or any portion thereof;

4.3.3 To bring an action for partition of the Company's property or to compel any sale or appraisal of the Company's assets;

4.3.4 To Transfer his Interest in the Company, except as provided in this Agreement;

4.3.5 To subject the assets of the Company (or any part thereof) to the authority of any Court or to any bankruptcy, insolvency, receivership or similar proceeding, such power being vested in the Manager.

Section 4.4 Members and Manager Not Personally Accountable. No Member or Manager shall be personally held accountable for any of the debts, obligations, losses, claims, judgments or any of the liabilities of the Company, whether arising in tort, contract or otherwise.

Section 4.5 Other Business. Each of the Members and the Manager, or any of them, may engage in any other business or profession, and in any other business venture of any nature or description, independently or with others, including, without limitation, the real estate business, including management and operation of apartment houses, hotels, office buildings and industrial buildings, and the Company and the Members shall not have any rights in and to such independent venture or the income or profits derived therefrom. No Member or Manager shall be

under any duty in respect of any other such business venture to disclose such business venture to the Members or to the Manager or to invite participation in such other business ventures by the Members, the Manager or the Company.

## ARTICLE V

## INITIAL CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

Section 5.1 Assignment of Purchase Agreement. Upon the execution and delivery of this Agreement, Najjar shall assign its rights and obligations under the Purchase Agreement to the Company in consideration for the Company reimbursing Najjar for its expenses in connection with the Purchase Agreement and for granting Najjar a membership interest in the Company.

Section 5.2 Initial Capital Contributions. 56 LLC shall contribute ~~_______________ ($_________)~~ One Hundred Sixty Six Thousand Five Hundred Twenty One ($166,521.00) Dollars to the capital of the Company ("Initial Capital Contribution"). The Initial Capital Contribution made by 56 LLC shall be paid by the Company to Najjar to reimburse Najjar for One Hundred Fifty-Five Thousand ($155,000) Dollars of funds deposited with the seller or the seller's agents under the Purchase Agreement and to reimburse Najjar for ~~_______________ ($_________)~~ Eleven Thousand Five Hundred Twenty One ($11,521.00) Dollars of costs and expenses incurred by Najjar to third parties in connection with the Purchase Agreement and the Property, which costs and expenses are itemized on Exhibit B annexed hereto.

Section 5.3 Capital Accounts. A separate Capital Account will be maintained for each Member.

5.3.1 The manner in which Capital Accounts are to be maintained shall comply with the requirements of IRC §704(b) and the Treasury Regulations promulgated thereunder. If in the opinion of the Company's accountants the manner in which Capital Accounts are to be maintained should be modified to comply with IRC §704(b) and the Treasury Regulations thereunder, then notwithstanding anything to the contrary contained in this Agreement, the method in which Capital Accounts are to be maintained shall be so modified.

5.3.2 No Member shall have any liability to restore all or any portion of a deficit balance in a Capital Account.

Section 5.4 Withdrawal or Reduction of Capital Contributions. A Member shall not receive out of the Company's property any part of a positive balance in its Capital Account or its Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions and Additional Capital Contributions have been paid or there remains property of the Company sufficient to pay them.

5.4.1 A Member has only the right to demand and receive cash in return for its Capital Contribution.

ARTICLE VI

INITIAL FINANCING, ADDITIONAL CAPITAL CONTRIBUTION AND LOANS BY MEMBERS

Section 6.1 Initial Financing. The Manager is solely responsible for securing the funds necessary to pay the Start Up Expenses including, without limitation, amounts needed to pay additional deposits under the Purchase Agreement or under any amendment thereto as and when required. To the extent that the Manager is able to do so, the Manager shall arrange third party financing for the Start Up Expenses, which financing shall be in such amounts and on such terms and conditions as the Manager shall determine, in its sole and absolute discretion, are in the best interest of the Company. The Company shall not dilute the Interest of Najjar in order to obtain third party financing for the Start Up Expenses .

Section 6.2 Additional Capital Contributions for Start Up Expenses. The balance of the funds needed by the Company to pay Start Up Expenses that are not funded through third party financing, shall be contributed by the Manager to the Company as an Additional Capital Contribution or Additional Capital Contributions, which balance is estimated to be $4,000,000.00. Najjar shall not be required to make any Additional Capital Contributions to the Company to pay the Start Up Expenses and Najjar's Interest shall not be diluted in order for the Company to pay Start Up Expenses.

Section 6.3. Additional Capital Contributions. Except as set forth above with respect to Start Up Expenses, in the event that the Company requires funds, the Manager may, in its sole and absolute discretion, give Notice to the Members stating the aggregate amount of Additional Capital Contributions required by the Company and the proportionate share that each Member is required to contribute. The amount of the Additional Capital Contributions due from each Member shall be determined in accordance with the respective Interest of each Member at the date of the Notice. The Notice also shall state the date when the Additional Capital Contribution is due, ~~which date shall not be less than~~ fifteen (15) days after the date of the Notice.

Section 6.4 Failure to Make an Additional Capital Contribution. If a Member fails to make all or any of an Additional Capital Contribution needed by the Company to fund expenses other than Start Up Expenses, such Member shall be referred to as a Failing Member and the Non-Failing Member shall have the right, but shall not be obligated, to lend to the Failing Member for contribution to the Company, all or any part of the sum that the Failing Member failed to contribute (the "Shortfall Amount"), which loan shall (i) bear interest at a floating rate equal to five (5%) percent per annum in excess of the Base Rate, (ii) be due and payable after 90 days, and (iii) be advanced by disbursing it directly to or at the direction of the Company. Any such loan shall be repaid on a first priority basis out of any subsequent distributions to which the Failing Member

of the Company. However, if for any reason any such loan is characterized in a manner that is inconsistent with the previous sentence, any tax item attributable to the interest accruing on such loan shall be allocated solely to the Failing Member. The Non-Failing Member shall have a security interest in the Failing Member's Interest.

6.4.1 The Failing Member hereby appoints the Non-Failing Member as its attorney-in-fact for the purposes of executing any and all documents, including, without limitation, promissory notes and transfer and sale documents, which the Non-Failing Member deems necessary to confirm the provisions of Section 6.4. It is expressly agreed that the power of attorney granted herein is coupled with an interest, and such power of attorney shall, to the extent permitted by law, survive the death, adjudication of incompetency or insanity, withdrawal, retirement, removal, bankruptcy or insolvency of the Failing Member.

6.4.2 If the Failing Member fails to make all or part of its Additional Capital Contribution and the Non-Failing Member does not lend to the Failing Member the sum that the Failing Member failed to contribute, a portion of the Non-Failing Member's Capital Contribution equal to the product of such Capital Contribution and the Failing Member's Interest shall be deemed to have been loaned by the Non-Failing Member to the Failing Member, shall be treated as a "Shortfall Amount" and shall be subject to the provisions of Section 6.4 and 6.5.

Section 6.5 <u>Reduction of Interest of Failing Member</u>. In the event that the Failing Member fails to repay such loan upon expiration of the 90 day term, together with accrued interest thereon, then on or before the fifth (5th) day following a written demand for payment made by the Non-Failing Member (the "Computation Date"), the Interest of each Member shall thereupon be recalculated as hereinafter provided as of the Computation Date. The Failing Member shall not be personally liable for the repayment of any such loan or the interest thereon. The sole remedy in the event any such loan is not repaid shall be to reduce the Interest of the Failing Member pursuant to this Section 6.5. The Failing Member hereby appoints the Non-Failing Member as its attorney-in-fact for the purpose of executing any and all documents and instruments necessary to confirm such recalculation of the Interests as herein provided. It is expressly agreed that the power of attorney granted herein is coupled with an interest, and such power shall, to the extent permitted by law, survive the death, adjudication of incompetency or insanity, withdrawal, retirement, removal, bankruptcy or insolvency of the Failing Member.

6.5.1 As of the Computation Date, the recalculation of the Interests of the Members shall be made as follows: the Failing Member's Interest shall be reduced by a percentage equal to 1.3 multiplied by the amount of the unpaid loan made pursuant to Section 6.4 (including accrued interest thereon) divided by the aggregate amount of capital contributed to the Company by the Members (including any amount loaned pursuant to Section 6.4 (without interest) less all distributions pursuant to Section 7.2.2 multiplied by 100. The Interest of the Non-Failing Member shall be increased as of the Computation Date by a percentage equal to the percentage decrease in the Failing Party's Interest.

Section 6.6 Loans to the Company. In the event that the Company requires funds in excess of the amount required pursuant to Section 6.1 to pay Start Up Expenses and one or more of the Members elect, in its or their sole discretion, to lend funds to the Company, the Manager shall have the right to cause the Company to borrow the necessary funds from one or more of the Members on a demand basis. The lending Members shall receive interest on the amount loaned to the Company calculated at the Base Rate plus two (2%) percent per annum. Money lent after opening

ARTICLE VII

PROFITS, LOSSES AND DISTRIBUTIONS

Section 7.1 Distribution of Net Cash Flow from Operations. All Net Cash Flow from Operations of the Company shall be distributed monthly, provided that such funds are available for distribution as determined by the Manager, in the following order of priority:

7.1.1 First, to the extent of, and in proportion to, the amounts required to be distributed to the Manager and Najjar so that each Member has received a return at a rate of ten (10%) percent per annum, compounded annually, on an amount equal to its Capital Contributions less any portion thereof returned pursuant to Section 7.2 hereof, from the date hereof through the date of such distribution; provided, however, in the event that after the third anniversary of the date that the hotel on the Property opens for business, the Net Cash Flow from Operations as determined at the end of the year to be distributed by the Company is less than Seven Hundred Fifty Thousand ($750,000) Dollars, then the rate of return shall be reduced from ten (10%) percent per annum to eight (8%) percent per annum. Fixed

7.1.2 Second, to the Members in accordance with their then Interests in the Company.

Notwithstanding the foregoing, in the event that any Member shall be a Failing Member and the Non-Failing Member elects to make a loan to the Failing Member pursuant to Section 6.4, then all amounts distributable to the Failing Member shall be paid to the Non-Failing Member until the Non-Failing Member has been repaid such loan in full with interest as provided in this Agreement.

Section 7.2 Distribution of Net Proceeds of Capital Transactions. All Net Proceeds of Capital Transactions shall be distributed by the Company at such time as shall be determined by the Manager, as follows:

7.2.1 First, to the extent that each Member has not received all amounts to be distributed to it pursuant to Section 7.1.1, such amounts shall be distributed to each Member so that each Member has received the amount it is entitled to receive pursuant to Section 7.1.1;

7.2.2 Second, to the return of all Capital Contributions which were not previously repaid pursuant to this Section 7.2.2 pro rata among the Members in accordance with the amount of the Capital Contributions made by each;

7.2.3 Third, to the Members, pro rata, in accordance with their then current Interests in the Company.

Section 7.3 Allocation of Profits and Losses. Profits and Losses of the Company shall be allocated among the Members with respect to each Fiscal Year in the following order of priority:

7.3.1 First, for each Fiscal Year or other applicable period, Profits shall be allocated to the Members, pro rata, to the extent of the excess of (i) the sum of the amount of cumulative distributions by the Company to such Member pursuant to Section 7.1.1 and the cumulative distributions by the Company to such Member under Section 7.2.1 over (ii) the cumulative amount of Profit previously allocated to such Member under this Section 7.3.1; and

7.3.1.1 Thereafter, to the Members pro rata in accordance with their Interests.

7.3.2 For each Fiscal Year or other applicable period, Losses shall be allocated to each Member in the following order of priority:

7.3.2.1 First, to the Members, pro rata to their Capital Account balance, until the Capital Account balance of each Member is equal to zero; and

7.3.2.2 Thereafter, to the Members, pro rata in accordance with their Interests.

ARTICLE VIII

REPRESENTATIONS AND COVENANTS OF MEMBERS

Section 8.1 Representations and Covenants of Najjar. To induce the Manager to enter into this Agreement, Najjar hereby represents and warrants to the Company and the Manager that:

8.1.1 Annexed hereto as Exhibit A is a true and complete copy of the Purchase Agreement.

8.1.2 The Purchase Agreement has not been modified or amended and is in full force and effect.

8.1.3 Neither Investment Associates nor Najjar are in default under the Purchase Agreement and Najjar knows of no facts which, with the giving of notice or the passage of time, would constitute a default under the Purchase Agreement.

8.1.4 There are no understandings or agreements between Najjar and Investment Associates or any Related Entity thereof except for the Purchase Agreement.

8.1.5 Najjar has made a deposit of One Hundred Fifty-Five Thousand ($155,000) Dollars with Investment Associates or its agents pursuant to the Purchase Agreement.

8.1.6 Annexed hereto as Exhibit B is a complete and correct schedule of expenses actually incurred by Najjar to third parties in connection with the Purchase Agreement and the Property.

8.1.7 Najjar has no knowledge of any condition or fact concerning the Property, properties adjacent to or in the immediate vicinity of the Property, the Purchase Agreement, Najjar or Investment Associates that could increase the Company's costs to develop a hotel on the Property or could delay the opening of such hotel for business that Najjar has not disclosed to Manager.

8.1.8 There are no facts concerning the shareholders, officers and directors of Najjar that could result in the New York State Liquor Authority denying a liquor license for the Property or could lead to a delay in the issuance of a liquor license. Najjar covenants that the shareholders, officers and directors of Najjar shall not take any action or perform any act that results in the denial by the New York State Liquor Authority of a liquor license or the loss of such a license.

8.1.9 Najjar is a corporation duly organized, validly existing and in good standing under the laws of the State of New York.

8.1.10 The execution, delivery and performance by Najjar of this Agreement has been duly authorized and approved by all requisite action on the part of Najjar. This Agreement when duly executed and delivered by Najjar will constitute a valid and binding obligation of Najjar and will be enforceable in accordance with its terms.

8.1.11 Najjar covenants that neither Najjar nor any Related Entity or agent, broker or finder acting with the authorization of Najjar shall, directly or indirectly, initiate contact with, or solicit, encourage or respond to any inquiries or proposals by, or enter into or continue any discussions or negotiations with, or disclose, directly or indirectly, any information concerning the Property, the Purchase Agreement, this Agreement or the hotel to be developed on the Property, or provide any access to any information relating to the Property, the Purchase Agreement, this Agreement or the hotel to be developed on the Property, to any person or entity other than the Manager in connection with any possible proposal for the direct or indirect acquisition, development, sale, financing, lease, transfer, assignment or other disposition of all or

any portion of the Property or any interest in Investment Associates. Nothing contained herein shall limit disclosures required in connection with any pending litigation or required by any regulatory agencies which have jurisdiction over Najjar or the Property. Najjar will provide the Manager with prompt notification of any request to disclose information in a pending litigation or to a regulatory agency and the Manager may seek an appropriate protective order.

Section 8.2 Representations and Covenants of the Manager. The Manager hereby represents and warrants to the Company and Najjar that:

8.2.1 The Manager is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York.

8.2.2 The execution, delivery and performance by the Manager of this Agreement has been duly authorized and approved by all requisite actions on the part of the Manager. This Agreement when duly executed and delivered by the Manager will constitute a valid and binding obligation of the Manager and will be enforceable in accordance with its terms.

8.2.3 The Manager covenants to Najjar that neither the Manager nor Related Entities shall attempt to circumvent Najjar with respect to the acquisition of the Property and shall not, directly or indirectly, negotiate to purchase the Property from Investment Associates other than as contemplated in this Agreement.

## ARTICLE IX

## TRANSFERS OF, AND RESTRICTIONS ON TRANSFERS OF INTERESTS OF MEMBERS

Section 9.1 General. Except as otherwise specifically provided in this Agreement, a Member shall not have the right to sell, assign, pledge, hypothecate, dispose of, exchange, gift, bequeath or otherwise transfer (collectively, "Transfer") all or any part of his Interest, including the right to receive allocations and distributions pursuant to Article VII. A Transfer of an Interest also shall include a sale, assignment, pledge, hypothecation, exchange, gift, bequest or other transfer of all or any portion of beneficial or of record interest in an inter vivos or testamentary trust, stock in a corporation, partnership interest in a partnership, membership interest in a limited liability company or an interest in any other entity that (i) owns all or any part of an Interest or (ii) owns all or any portion of an entity that owns all or any part of an Interest. Any purported Transfer that does not conform to the requirements of this Article IX shall be void, ineffective and shall not be recognized by the Company for any purpose.

Section 9.2 Permitted Transfers of Interests. A Member ("Transferor") may Transfer all or any portion of his Interest provided that the assignee is a Member (other than a Failing Member) or a Permitted Transferee, as such term is hereinafter defined.

9.2.1 "Permitted Transferee" shall mean:

9.2.1.1 When used with reference to a Transferor which is a corporation, partnership, limited liability company, trust or estate, the assignee of the Transferor, immediately before the transfer held stock of, or a beneficial interest in, the Transferor or is a Family Member of a person that, immediately before the transfer, held stock of or a beneficial interest in the Transferor.

9.2.1.2 When used with reference to a Transferor who is an individual:

(i) a Family Member, or

(ii) a corporation, partnership, limited liability company, trust or estate owned by such Transferor and/or Family Members of the Transferor.

9.2.2 An assignee who acquires an Interest under this Section 9.2 shall be admitted to the Company as a Member without requiring the Manager's consent, provided that the assignee complies with the conditions set forth in Section 9.5.

Section 9.3 Consent to Membership. Notwithstanding anything contained in this Agreement to the contrary, a Member (including the Manager) shall have no right to Transfer all or any portion of its Interest, including the right to receive allocations and distributions pursuant to Article VII unless the Manager consents to the admission of the assignee as a Member, in its sole and absolute discretion.

Section 9.4 Consent to Additional Members. An "Additional Member" is a person or entity who is admitted to the Company as a Member or who is a Member and receives an additional Interest in the Company in exchange for making an Additional Capital Contribution. Upon admission of the Additional Member, other Members shall have their respective Interests proportionately reduced. For example, in the event that the Company requires funds to cover operating losses after the first year of hotel operation, the Manager may elect to raise the necessary funds by having a third party make an Additional Capital Contribution to the Company in exchange for becoming an Additional Member with an Interest in the Company. A proposed Additional Member may become an Additional Member in the Company, provided that the Manager consents, in its absolute discretion, to the admission of the Additional Member, the conditions set forth in Section 9.4 have been satisfied, and the Interest of Najjar in the Company shall not, in any way, be diluted and distributions of the Company to Najjar shall not be adversely affected as a result of such admission.

Section 9.5 Conditions to Transfer and Admission of Additional Members. As a condition to recognizing the effectiveness and binding nature of any Transfer and as a condition to the admission of an Additional Member, the Company shall require the following:

9.5.1 The Member or Additional Member shall have (i) expressly assumed all of the obligations of being a Member hereunder, relating to or with respect to the Interest acquired from and after the effective date of the Transfer and, with respect to obligations that arose prior to the effective date of the Transfer, the Member shall assume the obligations of the Transferor arising from a failure to make a Capital Contribution and (ii) made a representation that his acquisition of an Interest is made as a principal for his own account, for investment purposes only and not with a view to the resale or distribution of such Interest, and that he will not Transfer such Interest or any fraction thereof to anyone who does not similarly so represent and warrant;

9.5.2 Assurance that the Transfer will not require registration of Interests under any federal or state securities laws and will not result in the Company being subject to the Investment Company Act of 1940, as amended;

9.5.3 Payment of all expenses incurred by the Company in connection with the Transfer;

9.5.4 Execution, acknowledgment and delivery of such other instruments, certificates, opinions or representations as the Manager may deem necessary or desirable; and

9.5.5 Notwithstanding anything to the contrary contained in this Article IX or in this Agreement, no Transfer shall be permitted nor shall any Additional Member be admitted as a Member of the Company if such Transfer or admission would violate any of the terms, provisions and conditions of any loan or any other material agreement or obligation affecting the Property or the Company.

Section 9.6 Effective Date of Transfer and Financial Adjustments. Any Transfer of an Interest or admission of a Member in compliance with this Article IX shall be deemed effective as of the date of the Transfer.

Section 9.7 Indemnity. The Transferor and the proposed assignee, jointly and severally, hereby indemnify the Company and the Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly from any Transfer or purported Transfer in violation of this Article IX.

## ARTICLE X

## DISSOLUTION AND TERMINATION

Section 10.1 Dissolution. The Company shall be dissolved and its affairs shall be wound up upon the earliest to occur of:

10.1.1 An election to dissolve the Company made by the Manager;

10.1.2 The distribution, pursuant to this Agreement, of the proceeds of the sale, exchange or other disposition of all or substantially all of the property of the Company;

10.1.3 Upon a Withdrawal Event by a Member, unless within one hundred eighty (180) days after such Withdrawal Event, the business of the Company shall be continued by the consent of the remaining Members owning a majority of the remaining Interests.

Section 10.2 Articles of Dissolution. The Manager shall execute an Articles of Dissolution in such form as shall be prescribed by the New York Secretary of State and file same with the New York Secretary of State's office within the time period required by the New York Limited Liability Company Law.

Section 10.3 Liquidation. Upon the dissolution and/or termination of the Company, the Manager shall proceed diligently with the liquidation of the Company and sale of its assets. The proceeds of such liquidation shall be applied and distributed in the following order of priority:

10.3.1 to the payment of the debts and liabilities of the Company including loans or advances that may have been made by the Members to the Company and expenses of liquidation;

10.3.2 to the setting up of any reserves which the Manager may deem reasonably necessary in order to meet any contingent or unforeseen liabilities or obligations of the Company arising out of, or in connection with, the business of the Company;

Said reserves shall be paid to an attorney-at-law of the State of New York, as escrow agent, to be held by him for the purpose of distributing such reserves in payment of the said contingent or unforeseen liabilities, and at such time as the Managers shall deem advisable, to distribute the balance remaining in the hands of the escrow agent in the manner hereinafter provided;

10.3.3 the balance, if any, to Members in accordance with the provisions of Section 7.2.

Section 10.4 Return of Contribution Non-Recourse to Other Members. Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return Capital Contribution, the Members shall have no recourse against any other Member.

ARTICLE XI

MISCELLANEOUS

Section 11.1 Address and Notices. All Notices, requests, demands or other communications hereunder shall be in writing and shall be deemed to have been given when delivered by personal delivery or three (3) days after having been mailed, by registered or certified mail, return receipt requested, postage prepaid, addressed to the person or persons to whom such Notice is to be given at the address of each Member of which the Company has received Notice. The address of the Company shall be 3010 Westchester Avenue, Purchase, NY 10577, Fax: (914) 694-8322. Notices may also be given by facsimile, with the original Notice being mailed on the date the facsimile is transmitted, or by overnight courier service with next business day delivery specified or by United States Express Mail with next business day delivery specified, in which event, the Notice shall be deemed delivered on (a) the date of facsimile provided that the facsimile is sent on a business day not later than 5:00 P.M. at the location where the facsimile is being sent or (b) the next business day in the event overnight courier service with next business day delivery specified or United States Express Mail with next business day delivery specified is used or if the facsimile is sent on a day which is not a business day or later than 5:00 P.M. at the location where the facsimile is being sent.

Section 11.2 Titles and Captions. All Article and Section titles and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

Section 11.3 Pronouns and Plurals. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine or neuter forms. The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

Section 11.4 Further Action. The parties shall execute and deliver all documents, provide all information and take or forbear from taking all such action as may be necessary or appropriate to achieve the purposes set forth in this Agreement or to comply with any laws, rules, or regulations.

Section 11.5 Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Members and their heirs, executors, administrators, successors, legal representatives and permitted assigns.

Section 11.6 Integration. This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof, and supersedes and replaces all prior and contemporaneous agreements and understandings, whether written or oral, pertaining thereto. No covenant, representation or condition not expressed in this Agreement shall affect or be deemed to interpret, change or restrict the express provisions hereof.

Section 11.7 Amendment. This Agreement may be modified by the Manager, provided that if such amendment would adversely affect the Interest of any Member other than the Manager, the consent of such Member shall be required.

Section 11.8 Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or by any other third parties.

Section 11.9 Severability. Any provisions of any applicable law that supersede any provisions hereof shall not affect the validity of the balance of this Agreement, and the remaining provisions shall be enforced as if the invalid provisions were deleted.

Section 11.10 Remedies Cumulative. Each right, power and remedy provided for in this Agreement or now or hereinafter existing at law or in equity or by statute, common law or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this Agreement or now hereinafter existing at law, in equity, or by statute, common law or otherwise, and the exercise of beginning by any Member of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by such Member of any or all of such other rights, powers and remedies.

Section 11.11 Partnership Status. Anything in this Agreement to the contrary notwithstanding, it is expressly intended that the entity formed hereby be a partnership as determined by the applicable provisions of the IRC, the rules and regulations promulgated thereunder, and other laws pertaining thereto, and that in every respect all of the terms and provisions hereof shall at all times be so construed and interpreted as to give effect to this intent. In the event that the Internal Revenue Service of the United State or any governmental authority having jurisdiction shall in any way or at any time determine that any provision or provisions of this Agreement adversely affects the status of this entity as a partnership, the Manager shall use its best efforts to amend or supplement the terms and provisions of this Agreement to the extent necessary to comply with the rules, regulations and requirements of the Internal Revenue Service of the United States or any other government authority having jurisdiction, in order that the entity formed hereby be treated as a partnership, be taxable as such, and the Members hereof be taxable as partners of a partnership, which modification or amendment shall be retroactively applied to the date of this Agreement. In the event that the Internal Revenue Service or any other governmental authority having jurisdiction adopts a provision permitting the entity formed hereby to elect to be treated as a partnership, the Manager shall make such election.

Section 11.12 Counterparts. This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on all parties, notwithstanding that all the parties are not signatories to the original or the same counterpart. Each party shall become bound by the Agreement immediately upon affixing its signature hereto, independently of the signature of any other party.

all the parties are not signatories to the original or the same counterpart. Each party shall become bound by the Agreement immediately upon affixing its signature hereto, independently of the signature of any other party.

IN WITNESS WHEREOF, the Members of the Company have executed this Agreement as of the day and year first above written.

MEMBERS

THE NAJJAR GROUP, LTD.

By:________________________
Name: Jesse Najjar
Title: Vice President

WEST 56TH HOTEL LLC

By:________________________
Name: Steven J. Caspi
Title: Member

By:________________________
Name: Richard Born
Title: Members

As to Section 3.11 Only

________________________
Jesse Najjar

81401.7

IN WITNESS WHEREOF, the Members of the Company have executed this Agreement as of the day and year first above written.

MEMBERS

THE NAJJAR GROUP, LTD.

By: ______________________
Name: Jesse Najjar
Title: Vice President

WEST 56TH HOTEL LLC

By: ______________________
Name: Steven J. Caspi
Title: Member

As to Section 3.11 Only

______________________
Jesse Najjar

81401.7