USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 11/25/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE NAJJAR GROUP, LLC, individually, and as successor-in-interest to THE NAJJAR GROUP, LTD.,

Plaintiff,

v.

WEST 56TH HOTEL LLC d/b/a CHAMBERS HOTEL,

Defendant.

---

No. 14-CV-7120 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff The Najjar Group, LLC brought suit against Defendant West 56th Hotel LLC for breach of the operating agreement governing BDC 56 LLC, an entity formed by Plaintiff and Defendant for the purpose of constructing and operating a hotel in New York City. The Court held a two-day bench trial on Plaintiff's claim that Defendant breached the implied covenant of good faith and fair dealing by depriving Plaintiff of its anticipated benefits under the agreement. For the reasons that follow, judgment shall be entered in favor of Defendant.

## BACKGROUND

Plaintiff and Defendant are two members of BDC 56 LLC, an entity that was formed in 1997 for the purpose of constructing and operating a hotel in midtown Manhattan. Plaintiff, which holds a 20% interest in the LLC, sold to the LLC its right to acquire the parcel of property on which the hotel was built, but otherwise assumed few responsibilities over the construction and management of the hotel. Defendant, which holds an 80% interest in the LLC, became the company's manager and was responsible for, among other things, managing the hotel and raising

the funds necessary for its construction. The dispute at issue here arose because, in order to acquire the funding necessary for the construction of the hotel, Defendant made additional capital contributions to the project far in excess of what the parties had estimated in their operating agreement. Because the operating agreement further provided for a preferred return on member capital contributions at a compounded rate of 8-10% per year, these additional capital contributions have had the effect of substantially delaying (and potentially extinguishing) any distributions to Plaintiff according to its membership interest. Although Plaintiff concedes that Defendant's actions complied with the express terms of the operating agreement, it argues that its failure to sell the hotel in order to preserve member equity was a breach of the implied covenant of good faith and fair dealing.

Plaintiff filed the initial complaint in this action on September 4, 2014. The Second Amended Complaint, which is the operative complaint, was filed in November of 2014. It alleged, among other things, that Defendant breached the operating agreement and acted in bad faith in order to deprive Plaintiff of its expected distributions as a 20% member of BDC 56 LLC. Defendant moved for summary judgment, principally arguing that Plaintiff's claims were barred by the applicable statute of limitations. The Court denied Plaintiff's motion, holding that genuine issues of fact remained concerning whether Defendant had, within the limitations period, continuously calculated its capital account balance in bad faith, thereby preserving the viability of Plaintiff's claims under the continuing wrongs doctrine. *See Henry v. Bank of Am.*, 48 N.Y.S.3d 67, 70 (1st Dep't 2017). Plaintiff subsequently abandoned its claims arising prior to September of 2008 and clarified that it was only pursuing claims based on conduct that arose within the limitations period.

The case proceeded to a bench trial in May of 2019. At trial, Plaintiff called three witnesses. Marlon Matza, a real estate broker, testified regarding the value of the hotel. He testified that, in his opinion, as of 2008 the hotel could have been sold for approximately 85 million dollars. Jay Gelbein, a certified public accountant, testified regarding his analysis of the hotel's financial records. He explained that because of the operating agreement's compounded interest rate on the preferred return of member capital contributions, the capital account balance has increased in most years, such that Plaintiff "would have to live a number of lifetimes to see some dollars based on that trend." He further testified that, in light of Defendant's capital contributions and the structure of the operating agreement, the only way for Plaintiff to have made money on the hotel was for Defendant to have sold it.

Elisha Najjar, an owner of Najjar Group LLC, also testified. Among other things, he testified that at the time he entered into the operating agreement, he had been in the construction business for approximately 40 years. He explained that he did not have any experience building hotels, and that he therefore approached Defendant about partnering to build and operate a hotel on the property that he had acquired. Najjar also testified that he knew at the time he entered into the agreement that, despite Defendant's experience operating hotels, Defendant had never before built a hotel from the ground up.

Although Najjar did not remember much about the parties' negotiations, he testified that he specifically requested the inclusion of certain of the operating agreement's provisions. For example, he testified that he was concerned about his membership interest being diluted and that he negotiated a provision preventing the diminution of his 20% interest. Najjar further testified that he was aware at the time he entered into the agreement that Defendant was required to contribute start up costs in excess of what was obtained through third party financing, and that he

3

in fact wanted that provision in the agreement because he did not want to invest any money into the construction of the hotel. Najjar additionally testified that, while both parties estimated that the amount of Defendant's contribution would be approximately $4 million, the parties did not negotiate a cap on the contribution or on the costs of construction.

Although informative in some respects, the reliability of Najjar's testimony was limited by his inability to recall the details of events that happened approximately twenty years ago. He frankly admitted that he could not remember the answers to many of the questions posed to him on cross-examination, at one point remarking, "Don't ask me what I had for breakfast." Highlighting the difficulties with Najjar's testimony, Defendant's counsel pointed out multiple inconsistencies between Najjar's deposition statements and his testimony at trial. For example, while Najjar stated at trial that he did not review the operating agreement with his counsel, in a prior deposition he testified that he had reviewed it with counsel. In addition, while he claimed at trial that he did not learn about Defendant's additional capital contributions until 2005, in his deposition he stated that he had learned about the contributions in 2002. Although the Court does not find that Najjar was intentionally deceptive during the trial, it is unable to credit the above portions of his testimony in light of the contradictions pointed out at trial and Najjar's admittedly flawed recollection of the events in question.

After the conclusion of Plaintiff's case, three witnesses testified for Defendant, two of whom testified solely by affidavit because Plaintiff waived its right to cross-examine them. Pedro Contreras, the accountant for BDC 56 LLC, testified by affidavit about the LLC's financial records and distributions. Among other things, he testified that all distributions were consistent with the requirements of the operating agreement and that the hotel's net cash flow has not yet been sufficient to extinguish the interest on member capital contributions. M. James Spitzer, the lawyer

who prepared the operating agreement, testified by affidavit that the agreement was structured so that Defendant assumed all responsibility for any excess start-up costs and in return received a negotiated preferred return on its capital contributions.

Finally, Ira Drukier, a member of West 56 LLC, testified about the operating agreement and his management of the project. The Court found Drukier's testimony to be frank and credible. Drukier testified that he has been involved in the operation of approximately 26 other hotels in Manhattan. He testified that some of the agreements he is a party to contain similar provisions for the distribution of net cash flow, including a preferred return on capital contributions at a rate of 8-10%. He further explained that such provisions are "fairly typical in the deals we run," because typically "investors get return on their capital," and "later the equity portion comes after the cash is serviced." Drukier explained that the deal with Plaintiff was different because Plaintiff did not put any money into the project; ordinarily, he explained, a non-manager would put money into the deal and would get a return on that money before there were any distributions. Drukier also testified that other parties he has negotiated with have required different provisions, such as provisions requiring the sale of the hotel within a specified period of time. He noted that there was no such provision in this operating agreement and remarked that "[we] don't negotiate on the other person's behalf."

Drukier also confirmed that, according to his records, Defendant's capital account balance increased in every year except for 2007 and 2008. When asked whether that trend would continue into the future, he replied that "it depends on how long your perspective is." Drukier explained that the hotel had gone through several challenging periods—including 9/11, the recession, and most recently, a period of increased direct competition from new hotels. He admitted that the rate of accrual was "hard to catch up to," and agreed that ultimately the capital account balance might

equal or exceed the value of the hotel. Drukier testified that although he never intends for that to happen, it does happen sometimes, and in such cases "the person who is supposed to get an equity split doesn't get one."

After the close of trial, the parties prepared post-trial briefing, which has now been fully submitted. In its post-trial briefing, Plaintiff argues that Defendant breached the implied covenant of good faith and fair dealing by failing to sell the hotel once it became apparent that Defendant's capital account balance was likely to continue to rise.

## DISCUSSION

### I. Findings of Fact[1]

Plaintiff Najjar Group LLC is a Florida limited liability company and is the successor in interest to Najjar Group Ltd.[2] Elisha Najjar, who is a member of Najjar Group LLC and was also a member of its predecessor, is a civil engineer with a background in finance. At the time that the operating agreement at issue in this case was signed, Najjar had approximately 40 years of experience in the construction business, but he did not have experience building hotels.

Defendant West 56 Hotel LLC is a New York limited liability company whose members include Ira Drukier, Richard Born, and Steven Caspi. Defendant is in the business of operating hotels and Drukier has been involved in the operation of 26 hotels in Manhattan. Born is Drukier's partner in all of these projects and Caspi is involved in some of them. At the time that the operating agreement at issue in this case was signed, Defendant had experience operating hotels, but—like Plaintiff—did not have experience building hotels.

---

[1] These findings of fact are based on the evidence presented at trial, including evidence regarding events that took place before 2008. In light of the Court's conclusion that Defendant is entitled to judgment on the merits, the Court need not rule on the alternative defenses raised by Defendant in its pre-trial motion, which was styled as a motion to exclude all pre-2008 evidence.

[2] Unless otherwise indicated, Plaintiff, The Najjar Group LLC, and Plaintiff's predecessor, The Najjar Group Ltd., are referred to interchangeably as "Plaintiff."

In 1997, Plaintiff entered into a purchase agreement with a third party for the purchase of a parcel of property located on West 56th Street in Manhattan. After acquiring the right to purchase the property, Najjar approached Caspi to discuss partnering with him in order to finance, build, and operate a hotel there. Plaintiff and Defendant then formed BDC 56 LLC for the express purpose of constructing and operating a hotel on the property that Plaintiff had purchased.

Pursuant to the terms of the LLC's operating agreement, Plaintiff assigned to BDC 56 LLC its right to purchase the West 56th Street property in exchange for a 20% membership interest in the LLC and the reimbursement of its deposit on the property. Defendant made an initial capital contribution of $166,521 to BDC 56 LLC, which was then paid by the company to Plaintiff as full reimbursement for Plaintiff's deposit and other expenses incurred in connection with the purchase of the property.

Defendant acquired an 80% interest in BDC 56 LLC and became its manager. As manager of the company, Defendant assumed the "full and complete authority, power, and discretion to manage and control the business, affairs and assets of the company." Operating Agreement ¶ 3.1. Defendant also assumed responsibility for securing the funding necessary for the construction of the hotel. Defendant agreed, "to the extent that [it was] able to do so," to "arrange third party financing for the Start Up Expenses, which financing shall be in such amounts and on such terms and conditions as [Defendant] shall determine, in its sole and absolute discretion, are in the best interest of the Company." *Id.* ¶ 6.1. In the event that additional funding was required for start up expenses beyond what was paid for by third party financing, the operating agreement required Defendant to pay the balance. The provision of the operating agreement setting forth this obligation stated as follows:

> The balance of the funds needed by the Company to pay Start Up Expenses that are not funded through third party financing shall be contributed by the Manager to the Company
7

as an Additional Capital Contribution or Additional Capital Contributions, which balance is estimated to be $4,000,000.00. Najjar shall not be required to make any Additional Capital Contributions to pay the Start Up Expenses and Najjar's Interest shall not be diluted in order for the Company to pay Start Up Expenses. *Id.* ¶ 6.2.

Defendant thus assumed, and Plaintiff expressly disclaimed, any obligation to pay the balance of the funds necessary to build the hotel not raised through third party financing. The operating agreement estimated that the amount of such additional capital contribution would be approximately 4 million dollars, which, according to Najjar's testimony, was based on both parties' independent calculations that the project would cost between 20 and 25 million dollars, and that a lending agency would require the company to put up 20% of the cost.

In March of 1999, Defendant secured a construction loan from Chase Mortgage Company in the amount of approximately $17.25 million. The principal amount of the loan was subsequently increased to approximately $19.25 million. Defendant contributed approximately $6 million in capital contributions to BDC 56 LLC in order to secure this loan. As construction of the hotel progressed, Defendant encountered multiple unanticipated costs. As provided for in the operating agreement, Defendant paid the balance of the funds necessary to complete the hotel—approximately $8.5 million dollars—as an additional capital contribution. Additional members were added to Defendant, but not to BDC 56 LLC, in order to raise the money to complete the hotel and avoid defaulting on the construction loan. Altogether, by 2002, Defendant had contributed nearly $15 million in capital contributions for start up expenses for the hotel. As negotiated for in the operating agreement, Plaintiff did not make any capital contributions for start up expenses and invested no capital in BDC 56 LLC.

The operating agreement provided that net cash flow from operations of the hotel would be distributed according to a specified order of priority. First, member capital contributions were to be returned at a rate of 10% per year (or 8% per year for years in which net cash flow from

operations did not exceed $750,000) compounded annually. Then, only after the return of member capital contributions, distributions were to be made to the members in accordance with their membership interests. As a consequence of these provisions, as well as of the fact that the hotel earned no money during the construction phase of the project, by 2002 (the first full year of the hotel's operation), Defendant's capital account balance totaled approximately $19.35 million. Furthermore, because of the compounded interest rate and several low-earning years for the hotel following the events of September 11, 2001 and the 2008 financial crisis, Defendant's capital account balance has in most years increased, rather than decreased. By 2018, according to BDC 56 LLC's records, Defendant's capital account balance amounted to approximately $35.4 million. Because Plaintiff made no capital contributions to the project, and the capital account balance has not yet been paid off, Plaintiff has yet to receive any distributions from BDC 56 LLC.

## II. Conclusions of Law

Plaintiff concedes that Defendant's additional capital contributions for start up expenses, as well as its distributions of net cash flow in accordance with the preferred return for member capital contributions, complied with the express terms of the operating agreement. It argues, however, that Defendant continuously breached of the implied covenant of good faith and fair dealing by continuing to operate the hotel, rather than selling it in order to protect Plaintiff's membership interest. The Court disagrees.

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995). "This [obligation] embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87 (1933)). "The duty of good faith and fair

9

dealing, however, is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" *Id.* (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983)). Thus, "[i]n order to find a breach of the implied covenant, a party's action must directly violate an obligation that may be presumed to have been intended by the parties." *Gaia House Mezz LLC v. State St. Bank and Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (internal quotation marks omitted).

Plaintiff argues that it may be presumed that the parties intended to require the sale of the hotel if it became likely that distributions according to membership interest would become substantially delayed or would never materialize. The evidence presented at trial, however, does not establish that the parties intended to impose any such obligation. To the contrary, the evidence shows that Plaintiff and Defendant intended the specific bargained-for exchange of risks and benefits that the operating agreement memorialized. Najjar, for instance, testified that he insisted on the inclusion of several provisions of particular importance to him: for example, that Plaintiff not be required to invest any money into start up expenses for the project and that Plaintiff's membership interest not be diluted. Najjar further testified that Plaintiff was fully reimbursed for its expenses in connection with the purchase of the property and that, following the reimbursement, he "had no equity whatsoever in the business." Defendant, on the other hand, contributed the initial capital required to reimburse Plaintiff for its deposit on the property, assumed sole responsibility for securing the financing to build the hotel, and assumed the further obligation to contribute any additional funding necessary for the completion of the project. In exchange for this assumption of 100% of the risk, it received a preferred return on its capital contributions. Drukier testified that the negotiated preferred return was "fairly typical in the deals we run," and that this deal was different only in that the non-managing member chose not to put any money into the deal.

Under these circumstances, Defendant's decision to continue operating the hotel, despite its growing capital account balance, was not a breach of the implied covenant of good faith. It was, instead, the exercise of its expressly negotiated contractual right. Plaintiff has not produced evidence sufficient to show that—as in the cases relied upon by Plaintiff—Defendant "exercised a right malevolently, for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits" of the agreement. *See Richbell Info. Servs. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 587 (1st Dep't 2003). Rather, the evidence shows that Defendant merely did what the operating agreement required it to do: it put up the additional capital required to complete the construction of the hotel, and it distributed net cash flow according to the priorities provided for in the contract. Courts have consistently held that such actions, consistent with the contract and not taken in bad faith, do not violate the implied covenant of good faith and fair dealing. *See LJL 33rd St. Assocs., LLC v. Pitcairn Properties Inc.*, 725 F.3d 184, 195–96 (2d Cir. 2013) (LLC member's decision to exercise a buyout option provided for in the operating agreement was not a breach of the implied covenant of good faith); *Gaia House Mezz LLC*, 720 F.3d at 93 ("Because [the defendant] acted consistently with the contract and did not violate a presumed obligation or [the plaintiff's] reasonable expectations, it was entitled to act in its own self-interest and require payment of the Accrued Interest, even if such action lessened [the plaintiff's] anticipated profits."); *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) ("[T]he implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.") (internal quotation marks omitted).

It is true that the estimated capital contribution provided for in the operating agreement turned out to be inaccurate, resulting in Defendant's contribution of far more capital than either

11

party had anticipated. But no evidence presented at trial suggested that Defendant misled Plaintiff in order to arrive at this estimate or that it was otherwise responsible for its inaccuracy. To the contrary, Najjar testified that he and Defendant independently arrived at roughly the same anticipated cost, resulting in the mutually agreed-upon estimate of $4 million in expected capital contributions. That the actual costs of construction turned out to be much higher than anticipated appears to have been a consequence of the parties' lack of experience building hotels, not bad faith. Finally, Defendant's simultaneous roles as manager and sole capital contributor—which Plaintiff now characterizes as a conflict of interest—were designed with Plaintiff's full knowledge specifically in order to accommodate Plaintiff's desire to neither manage the project nor put any money into it. That Defendant took actions consistent with these expressly negotiated, fully disclosed dual roles thus cannot fairly be described as bad faith self-dealing.

## CONCLUSION

For the foregoing reasons, Defendant did not breach the implied covenant of good faith and fair dealing by continuing to operate the hotel despite Defendant's growing capital account balance. The Clerk of Court is respectfully directed to enter judgment in favor of Defendant and to close this case.

SO ORDERED.

Dated: November 25, 2019
New York, New York

Ronnie Abrams
United States District Judge